United States District Court
Southern District of Texas
FILED

APR 0 2 2002

Michael N. Milby
Clerk of Court

IN THE UNTED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Mary Homer-Radtke | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) No. B-02-063 |
| | ) |
| John A. Radtke, | ) |
| | ) |
| Defendant. | ) |
| | ) |

PETITION AND COMPLAINT IN THE NATURE OF A PETITION FOR
INJUNCTIVE AND DECLARATORY RELIEF

1. Mary Homer-Radtke, an aggrieved party, petitions this court under authority of 28 USC 1332, 28 USC 2284 and F.R.C.P. Rule 57 for injunctive and declaratory relief. The *res* of this controversy exceeds five hundred thousand dollars ($500,000.00). Mary Homer-Radtke is a resident of Texas. John A. Radtke is a resident of Illinois.

2. Mary Homer-Radtke and John A. Radtke were joined in legal matrimony in 1967 in the state of Texas.

3. Petition for dissolution of marriage was filed in the state of Illinois in 1992. The marital estate of Mary Homer-Radtke and John A. Radtke as well as significant and valuable property interest segregable to the favor of Mary Homer-Radtke has been controlled by John A. Radtke to exclusion of Mary Homer-Radtke since. Hereinafter both the marital estate as well as property segregable to the favor of Mary Homer-Radtke shall be referred to simply as the "property."

4. Mary Homer-Radtke, in an effort to secure rightful portion of the property, has exhausted all remedies without conformation that Mary Homer-Radtke and John A. Radtke are legally divorced.

5. The value of the property has eroded considerably and Mary Homer-Radtke is deprived of income and enjoyment of a lawful portion of the property due to inability to discover a lawful determination of whether Mary Homer-Radtke and John A. Radtke remain legally married.

6. Ideals of substantial justice require this court discover, rule, and declare whether Mary Homer-Radtke and John A. Radtke are legally married or whether Mary Radtke (Homer) and John A. Radtke are divorced. The determination is a prerequisite to Mary Homer-Radtke having a theory of indemnity to foreclose interest in the property.

7. Ideals of fair play require Mary Homer-Radtke to, as soon reasonable and practical, list a full accounting of the property circa July of 1992, and for John A. Radtke to furnish legally sufficient documentation of the lawful dissolution of the marriage between Mary Homer-Radtke and John A. Radtke; or in the alternative, John A. Radtke shall state under oath to the satisfaction of this court that Mary Homer-Radtke and John A. Radtke are lawfully married.

8. Justice requires this court's injunction prohibiting John A. Radtke or any agent or anyone having power of attorney for John A. Radtke to sell, transfer, give, or dissolve through and means of conveyance, any of the property.

Prepared and submitted by: _____
Mary Homer-Radtke - Pro Se
1000 Camelot Drive, Number 6207
Harlingen, Texas 78550
(956) 423-7973

2

IN THE UNTED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Mary Homer-Radtke )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>John A. Radtke, )<br>)<br>Defendant. ) | No. __B-02- 063__ |

AFFIDAVIT

I, Mary Homer-Radtke, of lawful age and competent to testify, being first duly sworn, upon oath state as follows:

1.) I am disabled pursuant to the Americans with Disabilities Act as a result of being diagnosed with a congenital disease, Legg-Perthes Disease, 731.1, in 1953 by Dr. Turner of Rock Island, Illinois and Dr. Qualman of Grayslake, Illinois.

2.) I, Mary Ellen Homer, made a covenant under God on June 17, 1967 in a church ceremony solemnized by Pastor Joseph L. Auten of the First Presbyterian Church, Harlingen, Texas, with John Allen Radtke agreeing to marry and live as husband and wife until death do us part.

3.) The Marriage License, No. 16732, is currently recorded in Book 25, Page 267 with the county of Cameron, in Texas, and was accepted for value and recorded with the Secretary of State of Texas under U.C.C. filing No. 99-238423 in 1999, was accepted for value and recorded with the Secretary of State of Illinois and the county of Lake under filing No. 9708366/4465799 in January of 2000. A true, correct, and complete copy of the license, evidence of civil contract No. 16732, is attached hereto as Exhibit A.

4.) I provided financial support allowing John to continue his college education at Illinois Institute of Technology in Chicago, Illinois.

5.) The birth of our first child, Rebecca Marie Radtke born on December 21, 1969, was planned as a means to allow John to finish his education rather than be drafted into the United States Army.

6.) I agreed with John that I would be a "stay at home mom" while our children were young.

1

7.) In the summer of 1972, our family moved to Canada as a result of a corporate transfer.

8.) Our second child, Jeffrey Aaron Radtke, was born on September 23, 1972 in Montreal, Canada at the Catherine Booth Hospital.

9.) Although I had no earned income, I contributed financially to the marital estate through financial benefits for children provided by the Canadian government and by contributing monies, approximately $25,000.00, gifted to me from my parents.

10.) Late summer of 1976 we moved our famiily from Canada to Illinois as a result of our buying an 80% interest in B. Radtke & Sons.

11.) My parents provided a downpayment of approximately $10,000.00 for the purchase of our home located at 502 Dublin, Mundelein, Illinois in September, 1977.

12.) Our family grew in number with the birth of our third child, Jeremy Radtke, on October 17, 1978, and our fourth child, Jessica Lauren Radtke, on August 14, 1981.

13.) Our lives were focused on the success and expansion of the businesses with John as President/Treasurer and myself as Vice-President/Secretary of the corporation.

14.) The marital estate expanded with joint ownership of industrial properties, 101 W. Main and 112 W. Main St. in Round Lake Park, Illinois and the business expanded to include a screw machine division, a trucking business, a welding division, and a division for laser machining called Laserworks which was subsequently organized as a limited liability company.

15.) Documents related to the marriage were often sent and always stored in files/safe at one of our industrial buildings located in Round Lake Park, Illinois.

16.) Substantial loans, none of which have been discharged/paid, were made to the company at John's request by my parents, Helen and Fred Homer ($40,000.00), and by myself ($54,000.00 and $51,000.00 joint) but were not documented until 1989.

17.) The businesses historically provided family health care, insurance coverage, vehicles, transportation expenses, furniture, home repairs, business vacations, and B. Radtke & Sons, Inc., provided a base salary of $54,000.00 per annum which I was given to manage and pay the family expenses. Additional income was provided by machinery rental, property rental, key man insurance, and LaserWorks.

18.) On many occasions John promised me that our efforts were going to be well rewarded with a new home, early retirement, travel, and college educations for our children.

19.) I did not agree with John's methods of disciplining children which included using a belt and/or paddle but I could not deter John who believed that he was right metering discipline behind closed doors.

20.) I attended numerous parenting programs provided in the community.

21.) John exhibited sporadic episodes of violent behavior including, but not limited to, breaking the windshield in our van during a fight with our son Jeffrey, fighting with Jeffrey at the top of the basement staircase, beating his fists on the dashboard of the car, and punching a hole through the ceiling with his fist.

22.) These episodes of violent behavior usually involved and/or were witnessed by the children.

23.) John cried frequently and at times made threats to kill himself in front of the children.

24.) Our son, Jeffrey, became depressed and was chronically missing school and serving time in detention hall on the weekends.

25.) John's sister, Nancy Radtke, began disclosing transgenerational ritual abuse involving incest on or about 1985-86.

26.) We fostered a bi-racial child in 1985-87.

27.) Jeffrey acted out hitting our foster child.

28.) I arranged for Jeffrey to attend counseling with Rev. Wayne Langrebe.

29.) In 1988-91 I returned to school in order to get my Masters Degree in Social Work, with a concentration in mental health, as a result of doing foster care.

30.) My professional work which centered around counseling persons who had been ritually abused, taught me about the effects of trauma on the human psyche.

31.) John became progressively more secretive assuming control of the marital assets.

32.) I was forced to sign documents such as tax returns without an explanation that allowed John to dissipate tens of thousands of dollars of marital assets without my knowledge or consent. I provided documentation of monies owed me to John's attorney.

33.) John abandoned me in January of 1990 without giving an address.

34.) At the time, I was attending therapy with Marty Ziemer, a clinical social worker, in Grayslake, Illinois.

35.) At a joint meeting with Marty Ziemer, John refused to attend marital therapy saying that he wanted a divorce.

36.) I sought legal assistance from attorney Sally Lichter who was recommended by Marty Ziemer.

37.) In December of 1999, I learned that the petition for dissolution of marriage filed by Sally Lichter on July 7, 1992, Case 92D1279, was legally and factually defective pursuant to statute 750 ILCS 5/403 missing elements mandated as necessary to confer jurisdiction upon the court.

38.) Sally Lichter breached her fiduciary duty to me by drafting a self-serving petition allowing for her collection of attorney fees without protecting my financial interest in the marital assets or securing my investments (approximately $96,000.00) as non-marital gifts from my family.

39.) Sally Lichter told me that Illinois is a no fault state with grounds of "irreconcilable differences".

40.) John, through his attorney William Rosing, contested the grounds for dissolution of marriage on or about July 30, 1992.

41.) On July 30, 1992, an order was entered converting (conversion) my property under the control of John ; denying me my right to my property; denying me immediate possession of my property; and denying my demands for return of my property.

42.) The court order entered July 30, 1992 effectively put me on an allowance called "unallocated support" making John bailee of our marital property and my non-marital property which he held and controlled through the businesses and accounts.

43.) By court order, I was denied my right to access my property or receive income from my property which was minimally an annual $54,000.00 salary, equipment rental income, industrial property rental income and interest from my non-marital and joint loans to the company.

44.) John proceeded to cancel my company credit card, remove me as Vice-President/Secretary of the corporation, allegedly cancel my life insurance policy, and refuse to provide for expenses formerly covered by the company as provided in the Order of July 30, 1992.

45.) A suicide myth regarding the disappearance of our son Jeffrey in November of 1992 was perpetrated as a result of a train accident.

4

46.) Even though the body could not have been that of our son due to the discrepancies in the documented physical description and no positive identification, we had a funeral because John refused to examine the evidence or discuss the matter.

47.) I communicated to John what I had learned during counseling about the illegal drug trafficking system and was fearful for the safety of our children.

48.) Sally Lichter and subsequent attorneys were never able to get discovery from John.

49.) The record in this case shows that John's attorney withdrew in September of 1993 allegedly because John would not cooperate and provide discovery.

50.) The record in Case 92-D-1279 shows that attorney Sally Lichter breached her fiduciary duty to me failing to provide effective assistance of counsel due to a severely debilitating illness, Epstein Barr Virus, which she failed to disclose until March of 1995.

51.) I fired Sally Lichter because she was unavailable and was not providing effective assistance of counsel on or about April of 1994.

52.) In March of 1995, John hired attorney Kathleen Roseborough on the recommendation of Jarvis Friduss, C.P.A., personal tax accountant for John and corporate tax accountant for B. Radtke & Sons, Inc./ LaserWorks.

53.) Kathleen Roseborough spearheaded a civil conspiracy for the purpose of defrauding me of the marital assets and my non-marital loans to the company.

54.) Kathleen Roseborough represented herself as a former mediator which influenced me greatly because I was aspiring to become a mediator.

55.) Kathleen Roseborough represented Jarvis Friduss, C.P.A. as a professional who was called upon to testify in the court system as an expert witness.

56.) Settlement meetings were held at the offices of Jarvis Friduss, C.P.A.

57.) I heard Jarvis Friduss lie repeatedly, one time accusing me of failing to provide my 1992 tax information when it was John who failed to provide his personal and business tax information and claiming that the businesses were going bankrupt.

58.) John, Jarvis Friduss, and Kathleen Roseborough participated in an exclusive meeting preparing a marital settlement ($110,000.00) presented January 30, 1995, which John told me was designed to repay my non-marital loans to the company.

59.) I heard John say that I was barred from the settlement meeting on January 30, 1995 by Kathleen Roseborough because I asked too many questions.

60.) When John told me that the settlement was a repayment of my loans to the company, I rejected the settlement which I had signed under duress, and fired my second attorney, Douglas Stiles, for colluding with John, Jarvis, and Kathleen Roseborough.

61.) When I reported child abuse by John in November, 1994, Kathleen Roseborough demanded that we go to a child mediator.

62.) The child mediator, Ina Berkley, said that she was a former colleague of Kathleen Roseborough in the Chicago court system.

63.) I heard Ina Berkley say that Kathleen Roseborough contacted her and told her to ignore my information in written communications regarding child abuse and that Ina's only job was to prepare a joint parenting agreement.

64.) Ina Berkley told me that she is a mandated reporter of child abuse.

65.) I heard Ina Berkley repeatedly brag about her wealth.

66.) On more than one occasion, I heard Ina Berkley claim that she was called to testify in thousands of court cases as an expert witness.

67.) Between February 28, 1995 and April 1995, I acted on my own behalf.

68.) In March of 1995, Patrick Wade, purchasing agent for B.Radtke & Sons, Inc. and Tom Kron, C.P.A. and business manager for B.Radtke & Sons, Inc. told me that B.Radtke & Sons, Inc. was running independently of John and was doing well.

69.) I was told by employees of B.Radtke & Sons, Inc. that they would like me to manage the company and would support me financially.

70.) I sent a settlement proposal to Kathleen Roseborough for a trust arrangement whereby I would manage B.Radtke & Sons, Inc. and John would manage LaserWorks.

71.) Kathleen Roseborough sent me a letter saying that she would not negotiate a settlement between John and myself.

72.) I was contacted by John who said that Kathleen issued an injunction that I was not allowed to go to the companies or talk with the employees.

73.) The employees told me that John had told them that they were not allowed to talk to me.

74.) Jarvis Friduss, C.P.A. and John influenced Tom Kron, C.P.A. to engage in tax fraud by issuing me 1099 statements for income that I did not receive.

75.) The record in this case shows no evidence other than attorney Douglas Stiles' Petition for Attorney Fees of the mandatory pre-trial held on November 28, 1995 determining that $96,000.00 of my investments were non-marital because my non-marital investments were subsequently commingled with marital assets during mediation.

76.) I entered financial mediation because I was being denied due process by the court.

77.) It took me many years before I realized that Kathleen Roseborough and John secretly contracted with Elaine Collins of Meridian to provide private mediation services on or about May 11, 1995.

78.) Kathleen Roseborough conspired with Ina Berkley to recommend Elaine Collins and attend the financial mediation sessions herself.

79.) In a private conversation, Jarvis Friduss told me that there would be equal division of the business assets if I took B.Radtke & Sons, Inc. and John took LaserWorks – B.Radtke being a workhorse providing an annual income of $54,000 and LaserWorks having greater earning potential but a younger business.

80.) I wanted to quit private financial mediation because John was not negotiating in good faith, confidentiality was breached, and I was unable to get discovery.

81.) The mediators did not allow me to quit mediation saying that mediation was my only option because my attorney was 87 years old and incompetent.

82.) While Ina Berkley gained my trust by hugging me and telling me that I had to get out of my marriage because John was a "fucking bastard", she was conspiring with Elaine Collins converting the mediation process to a forum to defraud me.

83.) In April of 1997, I learned from receptionist, Char Steinbach, who had been fired by Elaine Collins/ Meridian that she witnessed a secret meeting between my husband, John Radtke, and Elaine Collins prior to Kathleen Roseborough drafting a settlement agreement favoring her client, John Radtke.

84.) On June 2, 1995, I was coerced to sign under duress a settlement prepared by Kathleen Roseborough which gave all the marital assets to John, gave my non-marital loans to the company, and defrauded the children of state mandated child support.

85.) I rejected the agreement immediately but Ina Berkley threatened to testify that I was mentally unstable which she said would threaten my having custody of the children.

86.) On June 6, 1995, the judge threatened that if I didn't accept the settlement as it was written, we would go to trial immediately and he would not look favorably upon me.

87.) When I said that I had signed the settlement under duress, the attorneys met in the judge's chambers and then took me into the hallway where they threatened me to recant or they would be living in my home and own the businesses.

88.) My mother, 87 years old, witnessed the judge threatening me.

89.) When I took my mother to the house of my brother, who is a retired judge, my brother yelled at me and told me that what was done could not be undone and said nothing about vacating judgments or appeals or recourse and remedy for the injustice.

90.) I heard my brother make statements that indicated he was talking to officers of the court and he told me repeatedly that the judges can do anything they want.

91.) I was never given a copy of the judgment.

92.) I went to the law library within 30 days and wrote by hand a Motion to Set Aside and Vacate for being denied due process and under duress, but my motion was not heard because John called and threatened me.

93.) I repeatedly demanded return of my property.

94.) Due to my fear of John, Jarvis, Ina, and Kathleen Roseborough, I hired attorney Sharon Keller to set aside and vacate and force the return of my property.

95.) Sharon Keller betrayed me holding me captive in a conference room while John, Kathleen Roseborough and she cut a deal forcing me to sign the order–April, 1996.

96.) I was exhausting my non-marital investment funds (approximately $96,000.00) gifted me by my mother to pay for our family living expenses.

97.) Our younger children were labeled by the school to be at risk because their school performance had deteriorated and they were self-medicating their pain.

98.) In 1998, John influenced the servicing agency of our mortgage company instructing them to foreclose on the family home so that he could purchase it at the Sheriff's sale.

99.) A foreclosure action, 98 CH 1240 was filed on December 11, 1998 by Associated Mortgage, Inc., a corporation unfamiliar to me, without cause.

100.) Not only were monthly interest and principal payments being made, but Associated Mortgage, Inc. claimed to be owner and holder of a promissory note which they admitted in an affidavit was lost – statute of frauds.

8

101.) John told me that he attempted to pay off the alleged amount owing but the attorney, Kim Casey, refused to assign the mortgage to him.

102.) John refused to allow our son, Jeremy, to access his trust funds to stop the foreclosure action.

103) Our children told me that John planned to buy our home in a Sheriff's sale.

104.) Judge William Homer told me that the court was going to take our home.

105.) I filed for bankruptcy on or about August 25, 1999 as a result of financial impoverishment.

106.) In my private capacity, I accepted for value and claimed all marital and non-marital assets filing financial statements with the Secretary of State in Texas in December of 1999 and the Secretary of State in Illinois in January of 2000.

107.) Out of necessity, I began going to the law library and learning about the law so I could litigate on my own behalf as a pauper.

108.) I wrote charging letters under Illinois statute, 720 ILCS 5/16-1.3, which makes financial exploitation of the elderly and disabled a Class 1 to Class 4 felony.

109.) I was unable to get the cooperation of the Office of the State's Attorney to prosecute in support of my charging letters.

110.) The State's Attorney, Michael Waller, is husband to Chief Judge Jane Waller who was the judge in my dissolution of marriage case, 92 D 1279.

111.) In December of 2001, I received an original taping of a television broadcast for a religious program exposing Satanism which was taped on or about 1995.

112.) The guest speakers are a former WICCA/Satanic cult member and an attorney who claims that Michael Waller and Jane Waller belong to a coven and are covering up illegal activities in the court system, specifically, child pornography and child abuse.

113.) I gave repeated notice that John and I are legally married.

114.) I sent repeated notice to Elsie Mannix that John and I are legally married.

115.) I saw an invitation addressed to my daughter and my son announcing the impending marriage of John Radtke to Elsie Mannix on August 6, 2000 in Mexico.

116.) I served subpoenas issued on or about June of 2000 to both Elsie Mannix and John Radtke to court for a hearing nunc pro tunc on setting aside and vacating the void judgment of June 6, 1995 – D & D Investigations were contracted to give service.

117.) The subpoenas for John, the judge, and the attorneys were quashed by John's attorney when they failed to appear and my motions were denied.

118.) Without a petition before the court and without notice, Judge Jane Waller entered on August 24, 2000 an injunction, a restraining order, against me prohibiting me from having any contact with John Radtke or Elsie Mannix.

119.) The restraining order had the effect of denying me access to my property and put me under the threat of arrest by John Radtke and/or Elsie Mannix.

120.) I appealed the denial of my nunc pro tunc motion to set aside and vacate, what I learned from my library research, was a void judgment of June 6, 1995.

121.) When the record was prepared for appeal, the clerk of the court told me that there was no judgment in the record.

122.) On or about January 9, 2001 John's attorney was granted sanctions against me for filing Bill Quia Timets and other documents filed for the purpose of correcting the record in Case 92 D 1279 and giving evidence that John and I remain legally married.

123.) John's attorney converted the sanctions against me to a judgment, filing a judgment lien with the Recorder of Deeds on February 5, 2001 slandering title to the property held in trust.

124.) On or about March 21, 2001, John and his attorney filed a Counterclaim against me in the foreclosure case, 98 CH 1240, asking for another judgment on the sanctions/ judgment that he had been granted in the dissolution case, 92 D 1279.

125.) On January 31, 2001, I was arrested in the law library by, in excess of five deputy sheriffs, while sitting typing at one of the computers – Case 01 CM 842.

126.) The bond was set at $10,000.00 with the condition that I not go into the law library or have contact with Andrea Burchardt, a library employee.

127.) I spent approximately one year defending myself against a misdemeanor charge which was ordered nolle prosequi "with prejudice" on December 4, 2001.

128.) In researching the law to prepare a motion to declare the marriage of John Radtke and Elsie Mannix in Mexico on August 6, 2000 invalid, I discovered a marriage license recorded in Lake County, Illinois which was solemnized by my brother, retired judge William Homer.

129.) In the spring of 1998, I learned that my brother, William Homer, is a 32nd Degree Mason which is considered a secret society.

130.) While attending professional seminars on secret societies, I learned that most judges are Masons and that the oath taken by Masons supersedes all other oaths.

131.) I have exhausted my financial resources and have no income source.

132.) My attempts at establishing a not for profit humanitarian business, failed.

133.) I do not have health insurance or dental insurance and am in need of dental and medical care.

134.) John refused to pay a dental bill sent him under the Family Expenses Act.

135.) I have been denied access to my property and income from my property.

136.) Public record shows dissipation and transference of marital assets through the purchase of properties in Wauconda, Illinois and Highland Park, Illinois.

137.) My children are being deprived because I cannot access the marital or my non-marital property.

138.) I believe that my son, Jeffrey Aaron Radtke, is alive but I do not have the financial resources to search for him.

139.) My mother is 94 years old and needs my care.

140.) My mother does not have the financial resources to support me.

141.) I have been denied a remedy in the trial court.

Further affiant sayeth naught.

Mary Homer-Radtke – PRO SE

STATE OF TEXAS    INDIVIDUAL ACKNOWLEDGMENT

COUNTY OF CAMERON

Before me, the undersigned, a Notary Public in and for said County and State on this __2nd__ day of __April__, 2002, personally appeared __Mary Homer-Radtke__ to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act.

Given under my hand and seal the day and year last above written.
My commission expires __09/27/04__
               Notary Public

11



DEBRA ANN FIGUEROA
Notary Public
STATE OF TEXAS
My Comm. Exp 09-27-2004

Exhibit B-1

THE STATE OF TEXAS } No. 16732
County of Cameron

To Any Person Authorized by the Laws of the State of Texas to Celebrate The Rites of Matrimony in the State of Texas, Greeting:

YOU ARE HEREBY AUTHORIZED TO SOLEMNIZE THE RITES OF MATRIMONY

Between Mr. John Allen Radtke and Miss Mary Ellen Homer and make due return to the Clerk of the County Court of said County within sixty days thereafter, certifying your action under this License.

WITNESS my official signature and seal of office at Brownsville, Texas,

the 16 day of June 19 67

J. H. DILTZ,
Clerk of the County Court, Cameron County.

By Jeffrenia C. Pamberton Deputy.

Mailed –
102 W. Gayle St.
Mendelein, Ill.
6-19-67

I, Joseph L. Austen hereby certify that on the seventeenth day of June 19 67 united in Marriage Mr. John Allen Radtke and Miss Mary Ellen Homer the parties above named

WITNESS my hand this 17 day of June 19 67

Joseph L. Austen, Pastor of First Presbyterian Church
402 E. Jackson,
Harlingen, Texas.

Returned and filed for record the 19 day of June, 1967, and recorded the 19 day of June, 1967.

J. H. DILTZ, County Clerk

By _____ C. Pamberton Deputy

Exhibit A

THE STATE OF TEXAS, COUNTY OF CAMERON

I, JOE G. RIVERA, COUNTY CLERK IN AND FOR CAMERON COUNTY, TEXAS, DO HEREBY CERTIFY THAT THE FOREGOING IS A FULL TRUE AND CORRECT COPY OF MARRIAGE LICENSE OF MR. **JOHN ALLEN RADTKE** AND MISS. **MARY ELLEN HOMER** TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF OFFICE, THIS THE 31 DAY OF **JULY** 20 **01**

VOL. **25**
PAGE **267**

JOE G. RIVERA, COUNTY CLERK
CAMERON COUNTY, TEXAS

BY JUAN ANDRADE



AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

_____ DISTRICT OF _____

MARY HOMER-RADTKE

v.

JOHN A. RADTKE

SUMMONS IN A CIVIL CASE

CASE NUMBER: B-02-~063

TO: (Name and address of defendant)

John A. Radtke
1641 Elmwood
Highland Park
Illinois 60035

John A. Radtke
℅ B. Radtke & Sons, Inc
101 W. Main St.
Round Lake Park
Illinois 60073

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael N. Milby, Clerk

CLERK

(BY) DEPUTY CLERK

DATE April 2, 2002